UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.

John Anthony Davis (2),

        Defendant.

Case No. 20-cr-209 (SRN/LIB) (2)

**REPORT AND RECOMMENDATION**

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant John Anthony Davis' Motion to Suppress. [Docket No. 60]. The Court held a Motions Hearing on December 8, 2021, regarding Defendant's pretrial motions.[1]

At the Motions Hearing, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant's Motion to Suppress, [Docket No. 60], was taken under advisement.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress, [Docket No. 60], be **GRANTED**, as set forth herein.

I.     **Background and Statement of Facts**

A.  **Background**

Defendant is charged with one (1) count of conspiracy to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846; one (1) count of possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and one (1) count of

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 111].

being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Indictment [Docket No. 1]).

**B. Facts**[2]

On June 4, 2020, at approximately 1:45 p.m., Officer Tyler Rosnau (hereinafter "Officer Rosnau") with the Mille Lacs Tribal Police Department was in his marked patrol vehicle travelling eastbound on Ataage Drive when he observed a silver Toyota Camry parked at Sheena Gahbow's residence which Officer Rosnau characterized as a "known drug residence." (Tr. 9– 12).[3] The Camry caught Officer Rosnau's attention because although he was familiar with "most vehicles on the reservation," he was not familiar with this particular Camry. (Id.). Officer Rosnau also observed a black male, who he had not previously seen, wearing a white tank top and blue jeans in the back seat of the Camry. (Id.). Officer Rosnau continued driving past the vehicle until he parked in a near by "snow removal area" where he would be able to observe the Camry when it drove away from the residence if it drove in his direction. (Id.).

Several minutes later, the Camry drove past Officer Rosnau, and he began following the Camry. (Tr. 22–33). After a brief drive, the Camry turned right into the merge lane on Highway 169. (Id.). Officer Rosnau then observed the Camry merge onto Highway 169 without the driver activating the Camry's turn signal. (Id.).

Officer Rosnau continued to follow the Camry, and after approximately ten seconds, Officer Rosnau activated his patrol lights to initiate a traffic stop of the Camry. (Gov't's Ex. 1).[4] After the vehicles came to a stop on the shoulder of the highway, Officer Rosnau immediately

---

[2] The facts contained in this section are derived from the testimony of Officer Tyler Rosnau, Officer Bradley Gadbois, Officer Timothy Kintop, and Mary Cablk, as well as, the parties' exhibits admitted in the present case.

[3] Throughout this Report and Recommendation, the Court refers to the transcript of the December 8, 2021, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 113]).

[4] Government's Exhibit 1 is a copy of the video from Officer Rosnau's patrol vehicle showing the June 4, 2020, traffic stop now at issue. (Gov't's Ex. 1). At the Motions Hearing, the Government, without objection, offered the video into evidence as Government's Exhibit 1. (Tr. 6). Citations to Government's Exhibit 1 are provided in the MM:SS format.

exited his squad vehicle; approached the Camry's driver side door; began speaking with the Camry's driver, who was later identified as Kennetha Lowe; and observed the Camry's passenger, who was later identified as Defendant. (Id.).[5] Officer Rosnau asked Ms. Lowe for her driver's license and insurance information, and she complied by providing her driver's license. Ms. Lowe could not immediately locate her insurance information.

Approximately fifteen seconds after Officer Rosnau exited his squad vehicle, Officer Bradley Gadbois (hereinafter "Officer Gadbois") and Officer Mike Dieter of the Mille Lacs Tribal Police Department entered the camera's view walking toward the Camry. (Id.). Officer Gadbois approached the passenger window, and after being at the window for approximate fifteen seconds, Officer Gadbois signaled to Officer Rosnau to have Officer Rosnau remove the driver from the vehicle. (Id.). Officer Rosnau instructed the driver to exit the vehicle, and the two walk back to Officer Rosnau's patrol vehicle. (Id.).

Officer Gadbois remained at the passenger's door speaking with Defendant. At the December 8, 2021, Motions Hearing, Officer Gadbois testified that as he approached the passenger's window, he observed Defendant "appear[ed] extremely nervous" while watching the interaction between Ms. Lowe and Officer Rosnau,  and Defendant was not wearing his seatbelt. (Tr. 89–90, 93). Officer Gadbois further testified that Defendant's "voice was shaky and wavering . . . ." (Tr. 90–91). Although Defendant was nervous at the beginning of the encounter, Officer Gadbois testified that Defendant's demeanor calmed as he interacted with the Officers. (Tr. 91). Upon Officer Gadbois' request, Defendant provide him with a picture identification card; however, it was later determined that Defendant provided Officer Gadbois with an identification card with a false name "out of Chicago, Illinois." (Tr. 95).

---

[5] Officer Rosnau's initial conversation with the driver cannot be heard on the video recording, although Officer Rosnau testified at the December 8, 2021, Motions Hearing that his initial conversation consisted only of explaining the reason for the stop. (Tr. 31).

Upon arriving at the front of his patrol vehicle with Ms. Lowe, Officer Rosnau returned Ms. Lowe's driver's license to her. (Gov't Ex. 2).[6] Officer Rosnau and Ms. Lowe began discussing her employment and her travels while Ms. Lowe continued to look for her insurance information on her cellular telephone. (Id.). After locating her insurance information, Ms. Lowe showed said information to Officer Rosnau to which Officer Rosnau responds, "OK, that works." (Id.). At the December 8, 2021, Motions Hearing, Officer Rosnau testified that the traffic stop was completed upon Ms. Lowe providing him with this insurance information. (Tr. 58, 61).

Immediately following Officer Rosnau telling Ms. Lowe "OK, that works," Officer Gadbois approached Ms. Lowe. (Gov't Ex. 2). Although the beginning portion of their conversation is captured on the footage from Officer Rosnau's body camera, Officer Rosnau walks away from the conversation approximately a minute after it began. (Id.). Although not seen on Officer Rosnau's body camera recording, Officer Gadbois testified that he "kind of laid it on the line to her," including telling Ms. Lowe of Defendant's "nervousness, the short-term traffic at a known drug house, the drug hub city kind of situation," and "them lying to [him] for no apparent reason." (Tr. 102). Officer Gadbois requested her consent to search the vehicle. (Tr. 102). After seeking her consent to search the Camry, Officer Gadbois stated the following to Ms. Lowe, "You can leave. Alright. But I gotta search, I'm gonna, ultimately we are either going to wait for a dog to sniff your car and if it alerts on your car then I'm going to search it or you can give me consent and I'll search it real fast. Regardless, this whole process is going to go a hell of a lot faster." (Gov't Ex. 2 at 00:00–00:50). Ms. Lowe responded that the Officers were "trying to scare her," and both Officer Gadbois and Officer Dieter stated that they were not trying to

---

[6] Government's Exhibit 2 is a copy of the video from Officer Rosnau's body camera showing a portion of June 4, 2020, traffic stop now at issue. (Gov't Ex. 2). At the Motions Hearing, the Government, without objection, offered the video into evidence as Government's Exhibit 2. (Tr. 6). Citations to Government's Exhibit 2 are provided in the MM:SS format.

scare her. (Id.). Ms. Lowe declined to provide consent to search the vehicle. (Id.). Officer Dieter told Ms. Lowe that "usually when people don't consent it kinda means they have something to hide." (Id.). The Officers then removed Defendant from the Camry, and they called dispatch to have a canine officer respond to the scene. (Id.).

For the following twenty-eight minutes, Defendant remained by the Camry speaking with Officers, and Ms. Lowe remained by Officer Rosnau's patrol vehicle. (Id.). Defendant and Ms. Lowe then moved with the Officers to the side of Officer Rosnau's patrol vehicle. (Id.). During this time they all discussed generic conversation topics. (Id.). While waiting for the canine officer, Ms. Lowe left the scene by walking to the nearby casino to use the restroom. (Id.). She returned to the scene soon after. (See, Id.).

Approximately one hour and ten minutes after the Officers called for canine assistance, Officer Timothy Kintop (hereinafter "Officer Kintop") of the Mille Lacs Tribal Police Department arrived at the scene with his canine partner, Karma. (Tr. 66–67). Upon arriving at the scene of the traffic stop, Officer Kintop looked into the Camry, and he informed Ms. Lowe that he would be taking the food out of the Camry. (Gov't's Ex. 4 at 4:20–5:49).[7] Officer Kintop opened the doors of the Camry, removed several white plastic bags from the vehicle, and placed the white plastic bags on the top of the Camry. (Id.).

Officer Kintop then asked Ms. Lowe if there was anything in the Camry that the officers "should know about." (Id.). Officer Kintop explained that the canine might "scratch [the car] if" there was something in the Camry that the canine detected. (Id.). Officer Kintop then returned to his patrol vehicle to retrieve Karma. (Id.).

---

[7] Government's Exhibit 4 is a copy of the video from Officer Rosnau's body camera showing another portion of June 4, 2020, traffic stop now at issue. (Gov't's Ex. 4). At the Motions Hearing, the Government, without objection, offered the video into evidence as Government's Exhibit 4. (Tr. 6). Citations to Government's Exhibit 4 are provided in the MM:SS format.

After leading Karma to the front of the Camry, Officer Kintop attempted to lead Karma around the vehicle in a circular pattern. (Id.). Karma did not comply. (Id.). Instead, Karma bit the leash, pulled on the leash with her mouth, and attempted to move away from the Camry. (Id.). Upon reaching the rear of the Camry, Officer Kintop appears to have attempted to reset Karma by having her sit, however, upon resuming the circular motion around the Camry, Karma continued not to comply by biting the leash, tugging on the leash with her mouth, and pulling away from the Camry. (Id.).

Ultimately, Officer Kintop retuned Karma to the area around his patrol vehicle. (Id.). During this time, Officer Kintop walked Karma in the grassy area near his patrol vehicle. (Gov't's Ex. 10).[8]

While Officer Kintop returned Karma to his patrol vehicle, Officer Gadbois continued to speak with Defendant and Ms. Lowe. (Id.). Officer Gadbois informed Ms. Lowe and Defendant that he had previously attempted to utilize Karma for an automobile sniff, but Karma refused at that time as well to comply. (Id.). Specifically, Officer Gadbois stated that although "he knew" there was "something" in the vehicle, Karma "shows up, doesn't wanna sniff. Fucking bites on him, runs around, [and] causes hell. Finally, he's like 'I can't get her to work, man.' You gotta cut'em loose." (Id.).

Officer Kintop then returned to the Camry with Karma. After returning to the front of the Camry, Officer Kintop led Karma by her leash around the Camry. (Id.). While circling the Camry, Officer Kintop intermittently tapped the vehicle, and he extended his arm inside the open windows. (Id.). After sniffing the front passenger's side door, Karma jumped into the Camry

---

[8] Government's Exhibit 10 is a copy of the video from another officer's body camera showing another portion of June 4, 2020, traffic stop now at issue. (Gov't's Ex. 10). At the Motions Hearing, the Government, without objection, offered the video into evidence as Government's Exhibit 10. (Tr. 6). Citations to Government's Exhibit 10 are provided in the MM:SS format.

through the open, front passenger's window. (Id.). Karma was inside the Camry for a moment before Officer Kintop guided her out of the vehicle's window. (Gov't's Ex. 10). Officer Kintop then opened the rear passenger's side door and guided Karma into the rear door. (Id.).

After removing Karma from the Camry, Officer Kintop asked Ms. Lowe and Defendant about the contents of the Camry's glove compartment, and he advised them Karma had alerted to the glove box inside the car. (Id.). Officer Kintop returned Karma to his patrol vehicle, and the Officers on the scene began searching the Camry. (Id.).

During their search, the Officers discovered Defendant's real Minnesota identification card and a significant amount of United States currency. (Id.). Defendant was subsequently placed under arrest. (Id.). Law enforcement also discovered suspected narcotics and a firearm in the trunk compartment of the Camry. (Id.).[9]

## II.    Defendant's Motion to Suppress. [Docket No. 60].

Defendant seeks to suppress all evidence flowing from the June 4, 2020, roadside search of the Camry. In support of this request, Defendant argues that law enforcement lacked reasonable, articulatable suspicion to stop the Camry, and even if the initial stop of the Camry was constitutionally permissible, law enforcement officers lacked reasonable, articulable suspicion to unreasonably extend the June 4, 2020, traffic stop to conduct the canine search of the vehicle. Finally, Defendant argues that even if law enforcement officers had reasonable, articulable suspicion to extend the stop in order to conduct the canine search, law enforcement lacked probable cause to search the vehicle because Karma's purported alert during the canine search was not reliable and insufficient to establish probable cause.

---

[9] Karma did not "alert" on the trunk of the Camry. No narcotics were located in the vehicle's glove box.

### A. Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)); see, United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001).

### B. June 4, 2020, Traffic Stop

As observed above, Defendant first challenges the initial stop of the Camry. (See, Def.'s Mem. [Docket No. 118]). Specifically, Defendant argues that Ms. Lowe, as the driver of the Camry, was not legally required to activate her turn signal when she merged onto the highway. (See, Id.). Thus, according to Defendant, Officer Rosnau lacked reasonable, articulable suspicion to initiate a traffic stop of the Camry on June 4, 2020.

Roadside traffic stops constitute seizures for the purposes of the Fourth Amendment. See, e.g., Delaware v. Prouse, 440 U.S. 648, 653 (1979). To be lawful, a traffic stop must be supported at least by a reasonable, articulable suspicion that a crime is being committed. Jones, 269 F.3d at 924 (citing Prouse, 440 U.S. at 663); United States v. Martin, 411 F.3d 993, 1000 (8th Cir. 2005). The Eighth Circuit Court of Appeals has repeatedly held that any traffic violation, no matter how minor, will provide at least a reasonable, articulable basis to justify a traffic stop. See, e.g., United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008); Martin, 411 F.3d at 1000; United States v. Travis, No. 14-cr-253 (DSD/SER), 2015 WL 439393, at *1,

11 (D. Minn. Feb. 3, 2015); <u>United States v. Maurstad</u>, No. 18-cr-300 (1) (SRN/KMM), 2019 WL 4863451, at *3 (D. Minn. Aug. 21, 2019), <u>report and recommendation adopted</u>, 2019 WL 4862029 (D. Minn. Oct. 2, 2019). "This is true even if [an objectively] valid traffic stop is a pretext for another investigation." <u>United States v. Linkous</u>, 285 F.3d 716, 719 (8th Cir. 2002).

Minnesota state traffic laws provide that "[n]o person shall . . . turn a vehicle from a direct course or move right or left on a highway unless and until the movement can be made with reasonable safety after giving an appropriate signal in the manner hereinafter provided." Minn. Stat. § 169.19, Subd. 4. As relevant to the use of a "[s]ignal to turn," Minnesota state law provides that "[a] signal of intention to turn right or left shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning"; however, "[a] person exiting a roundabout is exempt from this subdivision." Minn. Stat. § 169.19, Subd. 5. Officer Rosnau testified that he believed this law required the Camry to activate its turn signal when merging onto Highway 169 from an acceleration lane. Defendant disagrees with this interpretation.

The Court need not decide whether or not Minnesota law requires the activation of vehicle's turn signal when said vehicle merges onto a highway. The Court need only decide whether Officer Rosnau's belief was objectively reasonable. "An officer's mistake of law or fact may justify a stop so long as that mistake is objectively reasonable." <u>United States v. Foster</u>, 15 F.4th 874, 877 (8th Cir. 2021) (citing <u>United States v. Hanel</u>, 993 F.3d 540, 543 (8th Cir. 2021)).

In the present case, the Minnesota state law at issue is ambiguous. Neither party appears to disagree that there is ambiguity in the interpretations of these state laws. (<u>See</u>, Def.'s Mem. [Docket No. 118] (arguing that any ambiguity in these state laws should be resolved in his favor); Gov't Mem. [Docket No. 126] at 11–13).

Having reviewed the relevant law and the record now before the Court, the undersigned finds that, even assuming solely for the sake of argument that Officer Rosnau was mistaken in his belief that the Camry was required to use a turn signal when merging onto the highway from an acceleration lane, Officer Rosnau's belief under the circumstances was objectively reasonable. Other Courts have reached similar conclusions when determining purported mistakes of law regarding the interpretation of ambiguous state traffic laws and the use of turn signals. See, United States v. Spaid, 3:16-cr-30176 (RAL), 2017 WL 9292373, at *3–5 (D.S.D. Sept. 20, 2017); United States v. Gadson, 670 F. App'x 907 (8th Cir. Dec. 2, 2016). Put differently, when Officer Rosnau initiated the June 4, 2020, traffic stop of the Camry he had an objectively reasonable basis to believe that the driver of the Camry had committed a traffic violation. These circumstances represent reasonable, articulable suspicion to initiate the June 4, 2020, stop of the Camry.

For the reasons set forth above, the Court finds constitutionally permissible the initial stop of the Camry on June 4, 2020.

**C. Extension of June 4, 2020, Traffic Stop**

Defendant argues that even if the initial June 4, 2020, stop of the Camry was constitutionally permissible, the stop was impermissibly prolonged. In support of this contention, Defendant argues that law enforcement officers lacked reasonable, articulable suspicion to extend the stop beyond the point when Ms. Lowe provided her insurance information to Officer Rosnau and he determined that he had completed the purpose of the initial traffic stop.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated." U.S. Const. amend. IV. It is well established that a roadside traffic stop is a "seizure" within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979).

An officer may conduct an investigation reasonably related to the scope of a lawful stop. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). "Once this initial investigation is finished, however, the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, 'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention[.]'" Id. at 925; see, United States v. Anguiano, 795 F.3d 873, 876 (8th Cir. 2015). Without other reasonable and articulable suspicion, police may not extend an otherwise-completed traffic stop. See, Rodriguez, 575 U.S. at 353.

The question, here then, is whether officers had a further reasonable, articulable suspicion to extend the stop beyond the point when Officer Rosnau completed the necessary actions within the scope of the initial traffic stop. If the Officers lacked reasonable, articulable suspicion to expand the scope of the investigation, then the extension of the stop would be unreasonable. See, Id. at 353–57 (holding that, absent reasonable suspicion, seven- or eight-minute extension of traffic stop in order to conduct drug sniff violated Fourth Amendment). If the Officers had reasonable, articulable suspicion to justify expanding the scope of the investigation, however, the extension of the stop would not violate the Fourth Amendment. See, e.g., United States v. Maltais, 403 F.3d 550, 556–58 (8th Cir. 2005); United States v. White, 42 F.3d 457, 460 (8th Cir. 1994). "A reasonable suspicion is 'some minimal, objective justification' for suspicion beyond an 'inchoate hunch.'" United States v. Davis, 943 F.3d 1129, 1132 (8th Cir. 2019) (quoting United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004)).

To establish reasonable suspicion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" further investigation. Terry v. Ohio, 392 U.S. 1, 21 (1968). The concept of reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213 (1983). Instead, when determining whether reasonable suspicion exists, Court must consider the totality of the circumstances. United States v. Woods, 747 F.3d 552, 556 (8th Cir. 2014).

As observed above, Defendant contends that, even if the initial stop was lawful, it became unlawful when Officer Gadbois unreasonably extended the stop past the point at which Officer Rosnau completed the tasks within the scope of his initial traffic stop. In support, Defendant relies on Rodriguez v. United States, 575 U.S. 348 (2015), and its progeny. (See, Def.'s Mem. [Docket No. 118] at 37–42).

In Rodriguez, a canine-paired officer stopped Rodriguez for driving on the shoulder, a traffic violation. Rodriguez v. United States, 575 U.S. 348, 350–52 (2015). After the officer completed all tasks relating to the basis for the stop, he asked Rodriguez for permission to allow his dog to conduct a sniff-search of the exterior of Rodriguez's vehicle. Id. Rodriquez did not consent. Id. The officer then detained Rodriquez for approximately an additional seven minutes while he waited for a second officer to arrive, then retrieved his dog and conducted a sniff-search of the exterior of the vehicle, during which the dog indicated the presence of narcotics in the vehicle. Id. As a result, Rodriquez was indicted on narcotics charges. Id. He later moved to suppress the evidence gathered as a result of the stop. Id. The Magistrate Judge recommended that the motion be denied, concluding that although the officer did not have a reasonable articulable suspicion on which to prolong the stop after completing all tasks related to the initial

stop, the seven-minute extension of the stop was a de minimis intrusion on Rodriguez's Fourth Amendment rights. Id. The District Court and the Eighth Circuit agreed. Id. at 352–53. However, the Supreme Court reversed holding that the officer had been required to have a separate reasonable, articulable suspicion of criminal activity before he could extend the stop past the point at which he had completed all tasks related to the scope of the initial traffic stop. Id.

The present case is controlled by Rodriguez and the Eighth Circuit Court of Appeals cases applying Rodriguez. Applying this controlling precedent to the facts of this case, the Court finds that the Officers on the scene of the June 4, 2020, traffic stop of the Camry lacked other reasonable, articulable suspicion to extend the traffic stop beyond the moment in time when Officer Rosnau completed the actions necessary within the scope of his initial traffic stop.

As discussed above, Officer Rosnau had reasonable, articulable suspicion to stop the Camry because he had an objectively reasonable belief that the Camry had committed a traffic violation.

The basis for Officer Rosnau's stop of the Camry was the purported traffic violation. At the point in time when Ms. Lowe provided Officer Rosnau with her insurance information he acknowledges that he had completed the conduct necessary within the scope of the initial traffic stop, and the purpose or scope of the initial investigatory stop had thus concluded. The first step is to determine the time of this conclusion point.

At the Motions Hearing, Officer Rosnau testified that the initial scope of the June 4, 2020, traffic stop was completed when Ms. Lowe provide him with proof of her automobile insurance. (Tr. 58). Officer Rosnau further testified that, upon seeing Ms. Lowe's insurance information, he would have then permitted Ms. Lowe to leave with only a verbal warning, in accordance with his usual practice. (See, Tr. 35–36, 59). At the point in time when Ms. Lowe

13

provided Officer Rosnau with proof of automobile insurance, the purpose of the initial June 4, 2020, traffic stop had been completed. See, gen., United States v. Beck, 140 F.3d 1129, 1132–36 (8th Cir.1998) (finding that the traffic stop was complete because the officer had returned the driver's license and registration, issued a verbal warning, and told the defendant he was free to go).

Thus, to extend the stop past this instance in time, law enforcement officers needed an additional, separate reasonably articulable factual basis upon which to base suspicion of a different offense in need of further investigation. See, Rodriguez, 575 U.S. at 353. No such separate reasonable, articulable suspicion exists here.

The Government argues that law enforcement officers had reasonable, articulable suspicion that criminal activity was afoot because the Camry had been parked at a "known drug house;" Officer Rosnau had seen Defendant in the backseat of the Camry while at a known drug residence; Defendant and Ms. Lowe provided conflicting and false information; Defendant appeared nervous; and Defendant "provided (false) identification that registered from a known dug hub [Chicago]." The Court finds these collective arguments to be unpersuasive.

As a threshold issue, several of the rationales proffered by the Government are based on circumstances which undeniably occurred after the purpose of the original traffic stop had already been completed. Information learned or circumstances occurring after the completion of all conduct necessary within the scope of the initial traffic stop cannot, however, be retroactively utilized to establish reasonable, articulable suspicion to justify the extension of said traffic stop. See, e.g., United States v. Fickas, No. 21-cr-160 (WMW/LIB), 2022 WL 1090885, at *4 (D. Minn. Apr. 12, 2022). For example, Officer Gadbois' observation that Ms. Lowe and Defendant provided conflicting information was not known until after Officer Gadbois spoke with Ms.

Lowe, and Officer Gadbois did not speak with Ms. Lowe until <u>after</u> Officer Rosnau had completed the purpose of his original stop. Officer Gadbois had not spoken to or received any information from Ms. Lowe before the completion of all matters within the scope of the initial traffic stop.

The same is true for the Government's contention that Defendant provided false identification. The Officers did not know Defendant had provided false identification until the Officers located Defendant's Minnesota picture identification while later searching the Camry following the extended wait for the arrival of the canine officer and the canine handler's running the dog around the Camry.

The Court finds equally unpersuasive the Government's contention that Defendant providing false information to Officer Gadbois regarding having visited a "known drug house" as a basis to find the officers possessed reasonable, articulate suspicion. As it relates to Officer Rosnau, he did <u>not</u> speak with Defendant or become advised of Defendant's statements until <u>after</u> the completion of all matters within the scope of his initial traffic stop. Officer Rosnau, therefore, could not have formed any belief regarding the veracity of Defendant's statements prior to the completion of the initial traffic stop.

As it relates to Officer Gadbois, although he spoke with Defendant during the initial traffic stop, Officer Gadbois did <u>not</u> at that time actually have any information against which to test the veracity of Defendant's statements. While Officer Gadbois initially testified at the Motions Hearing that he was aware the Camry had been observed at a "known drug house" during his initial conversation with Defendant, Officer Gadbois later testified that he was unsure of whether he knew this information while he was speaking with Defendant or if he was provided this information <u>after</u> the completion of all tasks within the scope of the initial June 4,

2020, traffic stop. (Tr. 87, 92, 121). The record now before the Court demonstrates that Officer Gadbois did not receive any information from Officer Rosnau prior to the completion of the purpose of the initial June 4, 2020, traffic stop. The Court's review of the video recording record here finds that Officer Rosnau did <u>not</u> verbally provide any information to Officer Gadbois prior to the completion of his initial purpose of the traffic stop. And Officer Rosnau specifically testified at the Motions Hearing that he had no prior radio contact with Officer Gadbois regarding the purpose of the traffic stop nor about his purported earlier observation of the Camry at a "known drug residence." (Tr. 51–52).

On the record now before the Court, there is no evidence of any communication between Officer Rosnau and Officer Gadbois before the completion of the initial traffic stop. Thus, neither Officer Rosnau nor Officer Gadbois had possession of any additional, separate factual information provided by the other upon which to find a reasonable, articulable suspicion of a different offense in order to extend the stop to allow further investigation.[10]

At the point in time when the initial traffic stop had been completed, Officer Rosnau knew only the following information: the Camry had been parked at a "known drug residence"; Defendant had been in the backseat of the Camry when it was parked at the "known drug residence"; and Ms. Lowe, as the driver of the Camry, had merged onto the highway without activating the vehicle's turn signal. This is an insufficient factual basis upon which to find reasonable, articulable suspicion of a different offense in need of further investigation. Notably, the Government does not argue that this information alone is a sufficient basis to find the reasonable, articulable suspicion necessary to extend the Jane 4, 2020, traffic stop of the Camry.

---

[10] Although the Government largely bases its arguments on the collective knowledge of both Officer Rosnau and Officer Gadbois, under the circumstances of the present case, the Court may not consider the cumulative knowledge of all law enforcement officers in determining whether reasonable, articulable suspicion exists because the officers did not communicate any information to one another in the relevant time period.

Officer Rosnau did not appear to believe that such reasonable, articulable suspicion existed at the time because he was ready to end the traffic stop until the intervention of Officer Gadbois. (See, Tr. 57–58). Moreover, Officer Rosnau testified that he did not make any noteworthy observations upon approaching the Camry or in his interaction with Ms. Lowe, (Tr. 32), and he observed no "furtive movements" by either the Ms. Lowe or Defendant. (Tr. 58).

At the point in time when the initial traffic stop completed, Officer Gadbois knew only two relevant pieces of information: Defendant appeared nervous and Defendant's identification card was "out of Chicago, Illinois." This is an insufficient factual basis upon which to find reasonable, articulable suspicion of a different offense in need of further investigation. Here again, the Government does not argue that this information alone is a sufficient basis to find the existence of reasonable, articulable suspicion. As the Eighth Circuit Court of Appeals has highlighted, "[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." United States v. Beck, 140 F.3d 1129, 1139 (8th Cir. 1998) (quoting United States v. Wood, 106 F.3d 942, 947 (10th Cir. 1997) ("It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer.")); United States v. Guerrero, 374 F.3d 584, 590 (8th Cir. 2004) ("nervousness is also of limited significance, as this court has held that it cannot be deemed unusual for a person to exhibit signs of nervousness when confronted with an officer"); United States v. Fickas, No. 21-cr-160 (WMW/LIB), 2022 WL 1090885, at *3 n.1 (D. Minn. Apr. 12, 2022). Furthermore, the identification card provided by Defendant being "out of Chicago" is likewise an insufficient basis to find Officer Gadbois possessed the reasonable, articulable suspicion necessary to extent the June 4, 2020, traffic stop. See, Reid v. Georgia, 448 U.S. 438, 441 (1980) (holding that defendant's arrival from "source city" was an

insufficient foundation for reasonable suspicion and stating the "circumstances describe a very large category of presumably innocent travelers"); United States v. Beck, 140 F.3d 1129, 1138 n. 3 (8th Cir.1998) (detailing that a review of case law revealed that officers have termed a significant number of the largest cities in the United States as "drug source cities" and finding this designation as a "weak factor" in determining whether reasonable, articulable suspicion exists); United States v. Andrews, 600 F.2d 563, 566–67 (6th Cir. 1979) ("[O]ur experience with DEA agent testimony . . . makes us wonder whether there exists any city in the country which a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center."). This is not even a case in which Defendant was travelling to or from a purported "drug hub"; instead, the identification card provided by Defendant was merely "out of Chicago." See, United States v. Beck, 140 F.3d 1129, 1132–36, 1138 (8th Cir.1998) (highlighting the distinction between travelling to or from a source city versus merely having a vehicle registered to a purported source city). The information possessed by Officer Gadbois was an insufficient factual basis upon which to find the existence of reasonable, articulable suspicion of a different offense in need of further investigation.

In summation, at the time the initial traffic stop had been completed, neither Officer Rosnau nor Officer Gadbois had an independent reasonable, articulable suspicion to extend the stop beyond that point. Thus, the extension of the June 4, 2020, traffic stop was constitutionally impermissible beyond the moment in time when Officer Rosnau completed the actions within the scope of his initial traffic stop, i.e., when Officer Rosnau was provided and observed the insurance information by Ms. Lowe. See, Rodriguez, 575 U.S. at 353. This represents a sufficient, independent reason to grant Defendant's Motion to Suppress. See, Id.

Therefore, to the extent Defendant's Motions to Suppress seek the suppression of all evidence obtained <u>after</u> Ms. Lowe presented her proof of insurance to Officer Rosnau, the undersigned recommends that Defendant's Motions to Suppress, [Docket No. 60], be **GRANTED**.

In an abundance of caution, the Court will address the parties' arguments related to whether canine officer Karma's purported alert[11] during the canine sniff of the Camry is sufficient to support the requisite probable cause for a warrantless roadside search of the Camry. The Government argues that Karma was reliable, and Karma's positive alert created probable cause to allow an on the spot search of the Camry. (Gov't's Mem. [Docket No. 126] at 17–22). Defendant argues that on June 4, 2020, Karma was not a reliable narcotics detection canine, did not perform a reliable alert for narcotics, and "was deployed in a manner which represents an egregious and bad faith violation of the Fourth Amendment." (Def. Mem. [Docket No. 118] at 45–63).

Assuming solely for the sake of argument that the Officers had the reasonable, articulable suspicion necessary to extend the traffic stop to permit Karma to conduct a perimeter sniff of the Camry, on the record now before the Court, the Officers lacked the probable cause necessary to search the Camry. Karma's purported alert while sniffing the Camry is insufficient to establish the probable cause necessary to search the Camry at the June 4, 2020, traffic stop.

---

[11] Because the Court has already determined that the Officers lacked reasonable, articulable suspicion to extend the traffic stop to permit the canine sniff and because the Court below finds that any alert by Karma on June 4, 2020, was an insufficient basis upon which to find probable cause, the Court does not address the issue of the propriety of Karma's purported alert. It is concerning, however, that Officer Kintop specifically testified that Karma did not "alert" until after Karma entered the Camry. (Tr. 155, 159). Although the Court need not decide the issue here, it appears that both Karma's entry into the Camry and Officer Kintop's entry into the Camry would be considered searches under the Fourth Amendment, and both of these searches occurred prior to Karma's purported alert. Officer Kintop himself testified that Karma did not provide the "final response" or "alert" until she was inside the Camry. (Tr. 182). Equally concerning is Officer Kintop's later testimony that Karma "never did a full and final alert," and the Camry "was still searched absent a full and final response," (Tr. 222), which specifically contradicts Officer Kintop's testimony that Karma made "an alert" on the "glove compartment." (Tr. 159).

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). One of these exceptions is the "automobile exception." United States v. Williams, 616 F.3d 760, 764 (8th Cir. 2012).

"[T]he 'automobile exception' permits the warrantless search of a vehicle if the police 'had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began.'" United States v. Vore, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003)). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005). In making the probable cause determination, Courts "apply a common sense approach and consider all relevant circumstances." Id.; see, United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003).

As the Eighth Circuit Court of Appeals has explained, "[a]ssuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." United States v. Donnelly, 475 F.3d 946, 955 (8th Cir. 2007) (citing United States v. Sundby, 186 F.3d 873, 875–76 (8th Cir. 1999)). "To establish the dog's reliability," the sworn testimony or "affidavit need only state the dog has been trained and certified to detect drugs." Sundby, 186 F.3d at 876. The Eighth Circuit Court of Appeals has found a dog reliable were the dog "received consistent training," "had been examined and considered competent by independent evaluators," "had been properly certified," "had been considered reliable by prior courts," and had an "accuracy rate [which] exceeded fifty

20

percent," even where the dog's field accuracy rating was only fifty-four percent. Id. Courts use these factors in considering "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Florida v. Harris, 565 U.S. 237, 247 (2013).

In the present case, Karma falls short of the necessary reliability standard utilized by the Eighth Circuit Court of Appeals. On the record now before the Court, there is no indication Karma had been considered reliable by any prior Court. Moreover, at the time of the June 4, 2020, traffic stop, Karma was not a certified drug detection dog. (See, Gov't's Ex. 11).[12] Karma was certified on April 8, 2018, but that certification expired on December 31, 2019. (Id.) ("All certifications are good through December 31st of the following year."). Karma was not certified again until January 17, 2021, well after the June 4, 2020, traffic stop now at issue. (Id.).[13] Although the Government attempts to explain this gap in certification by conclusorily referencing the circumstances surrounding the Covid-19 pandemic, it does not alter the fact that on June 4, 2020, Karma was not a properly certified narcotics detection canine. The record now before the Court simply lacks any evidence demonstrating that the canine certification process was (nor could be) held in abeyance for any period of time due to the Covid-19 pandemic. More importantly, the Government fails to proffer any argument demonstrating that such hypothetical suspension of the canine certification process would be constitutionally permissible. In short, at the time of the June 4, 2020, sniff of the Camry, Karma was not a certified narcotics detection canine, and at that time, Karma had not been a certified narcotics detection canine for over five months. (Id.).

---

[12] Government's Exhibit 11 is a copy of Karma's certification records. (Gov't's Ex. 11). At the Motions Hearing, the Government, without objection, offered these training records into evidence as Government's Exhibit 11. (Tr. 6).

[13] Although Officer Kintop provided some testimony that there should have been a certificate from April 2019, there is no such certificate in the record now before the Court, and the Government has not argued that any such certification exists.

Karma's lack of certification is not saved by the Government's proffer of Karma's purported training records. Although the Government asserts that Karma had received "consistent, ongoing training," there is no evidence in the record demonstrating even a minimally favorable performance by Karma during any of these so called training exercises.

Training records offered in support of the reliability of a narcotics detection canine must contain sufficient information to permit a Court to determine said canine's reliability in detecting narcotics. See, gen., Florida v. Harris, 565 U.S. 237, 247–50 (2013). In the present case, Karma's purported "training records" fall well short of this requirement. For example, Officer Kintop testified that he would train Karma by hiding narcotics in a particular location, such as a school's classroom, to see if Karma would alert to the presence of narcotics. Officer Kintop recorded these trainings by taking a picture of the hide location and writing the date of the training on the picture. (See, Gov't's Ex. 13).[14] There is no indication in these records, however, as to whether or not Karma actually successfully located the narcotics on any of the dates indicated. (See, Id.). Even assuming solely for the sake of argument that Karma did find some of the hidden narcotics, the records lack any indication as to the manner in which Karma was utilized in locating the narcotics, the length of time Karma required to locate the narcotics, the number of times Karma passed the narcotics without alerting, or the state of the environment surrounding the training. (See, Id.). Although Officer Kintop testified that he also occasionally trains with other canine officers, including officers from other organizations, he does not keep any records regarding such purported training. (Tr. 169).

There are additional concerns regarding the offered purported "training records." Some of the record entries do not even contain a picture. Instead, some of the entries are merely

---

[14] Government's Exhibit 13 is a copy of "Karma Training Records" in the form of these photographs. (Gov't's Ex. 13). At the Motions Hearing, the Government, without objection, offered these training records into evidence as Government's Exhibit 13. (Tr. 6).

handwritten notes. (Gov't Ex. 11). One such entry provides only the following: "2-20-17 UNKNOWN HIDE PARTS BIN 5.3 G METH." (Id.). As with the other records, there is no indication of whether Karma located the narcotics, and if she did locate the narcotics, there is no indication of the methods used to do so. (Id.). Even more concerning is the fact that the most recent record entry is dated April 1, 2019. (See, Id.). There is no record of any training of Karma after April 1, 2019.[15] In other words, there is no record of any training whatsoever of Karma for the fourteen months prior to the June 4, 2020, stop of the Camry now at issue. Given this lack of substantive training records, the Court cannot reasonably conclude that Karma had received proper, consistent training at the time of the June 4, 2020, stop of the Camry.[16]

The concerns surrounding this lack of meaningful training records is exacerbated by Officer Kintop's description of his training process. For example, when asked whether Karma had ever "missed a [narcotics] hide" during training, Officer Kintop responded in the negative. (Tr. 169). Officer Kintop then stated that "sometimes [Karma] has to work a little harder than others and, you know, when we're working together with somebody, I'll say, No, it's in here. It's usually what I'm doing wrong. I'm not getting her to the spot, you know." (Tr. 169). From Officer Kintop's testimony, it appears that Officer Kintop characterizes any find by Karma as a successful find even if he leads Karma to the known location of the narcotics by telling her "it's in here." (See, Tr. 169).

The negative impact caused by this lack of meaningful training records is compounded by Officer Kintop's testimony regarding the lack of supervision over his deployment of Karma, Karma's training, or the accuracy of their working together. Specifically, Officer Kintop testified

---

[15] Although Officer Kintop speculated that there may be additional training photos on his computer, no such records were provided by the Government, and the Government does not argue that any such records exist.
[16] The lack of substantive records also prevents the Court from determining whether Karma had an adequate accuracy rating during her training.

23

that he is his own supervisor, that "nobody" checks his canine deployment records, and "nobody" monitors his training records. (Tr. 174). If his sergeant was in the office at the time, Officer Kintop might inform his sergeant that he was going to train, but the sergeant would not have observed or monitored the training, and he would not have been advised of the results of said training. (Tr. 174). Officer Kintop also testified that there was no supervisor or other officer who monitor Karma's proficiency assessments. (Tr. 175).[17]

When considering the on scene facts surrounding Karma's purported alert through the lens of common sense, there are additional factors which would preclude a reasonably prudent person from relying on Karma to support thinking that a search of the Camry on June 4, 2020, would reveal contraband or evidence of a crime. Most notable is Officer Kintop's repeated testimony regarding Karma being "distracted" by the odor of food. (Tr. 150, 184–85, 203, 205–06). Officer Kintop testified that Karma has a history of being distracted by food, and with regard to food, Karma "just goes for it." (Tr. 185, 203). Officer Kintop testified that in a previous conversation with another law enforcement officer he stated "[o]ur dog goes after food sometimes and that's not right . . . the dog goes in and finds food . . . ." (Tr. 203). In the present case, this is concerning because there was food in the Camry immediately before Karma sniffed the Camry,[18] and Officer Kintop testified that Karma has a history of being distracted by food to the point that she will "just go[] for it." Additionally, Officer Kintop's testimony that Karma has a history of becoming "a little animated in her breathing" in the presence of food is especially

---

[17] Equally concerning is Officer Kintop's testimony regarding his report writing when it involves a deployment of Karma. As observed above, the first time Officer Kintop deployed Karma at the scene of the June 4, 2020, stop of the Camry, Karma refused to comply with Officer Kintop's commands and generally refused to sniff the Camry. Officer Kintop did not include this refusal by Karma in his report, and he testified that he declined to do so because "[w]e didn't do anything." (Tr. 176). His testimony seems to indicate that he would never include in his report any such failure by Karma. (See, Tr. 176).

[18] Although Officer Kintop removed the physical food containers from the Camry, he further testified that the odor of food remained because he did not permit the odor to dissipate.

concerning because this is also an indicator Officer Kintop noted Karma exhibits in the presence of narcotics. (Tr. 185).[19]

There are yet still additional on scene factors which would lessen the probability that a reasonably prudent person would think that a search of the Camry on June 4, 2020, would reveal contraband or evidence of a crime. As already noted above, the first time Officer Kintop attempt to have Karma perform an exterior sniff of the Camry, Karma refused to comply. Rather than do as instructed Karma bite on her leash, pulled her leash with her mouth, and attempted to move away from Camry. Moreover, the comments of Officer Gadbois on the scene of the June 4, 2020, traffic stop increase the negative effects of reliance on Karma because her refusal to comply was known by Officer Gadbois to undermine the probability that a reasonably prudent person would think that a search of the Camry on June 4, 2020, would reveal contraband or evidence of a crime. As observed on the video evidence in this case, Officer Gadbois told Ms. Lowe and Defendant about a previous traffic stop where he attempted to utilize Karma to sniff a vehicle because Officer Gadbois "knew" there was "something" in the vehicle, but Karma refused to comply. (See, Gov't Ex. 10). Officer Gadbois explained that Karma "shows up, doesn't wanna sniff. Fucking bites on him, runs around, [and] causes hell. Finally, [Officer Kintop is] like 'I can't get her to work, man.' You gotta cut'em loose." (Id.).

In summation, even assuming solely for the sake of argument that the Officers possessed reasonable, articulable suspicion to extend the June 4, 2020, traffic stop to include the canine sniff by Karma, on the record now before the Court, the Government has failed to demonstrate that, at the time of the June 4, 2020, traffic stop, Karma had received consistent, proper training; "had been examined and considered competent by independent evaluators"; "had been properly

---

[19] The Court does not find that the presence of food renders a canine sniff of an automobile any less reliable. Rather, in the present case, Karma's reliability is lessened by the presence of the odor of food because Officer Kintop specifically testified that Karma has a history of being distracted by food.

certified"; "had been considered reliable by prior courts," or had an accuracy rating in excess of fifty percent. Based on a totality of the circumstances and for all the reasons discussed above, the undersigned finds that the Government has failed to demonstrate Karma to be a sufficiently reliable narcotics detection canine, pursuant to the guidelines set forth by the Eighth Circuit Court of Appeals. Thus, any purported alert by Karma on the Camry is alone an insufficiently reliable basis to establish or support a belief that probable cause existed for the presence of a controlled substance inside the Camry on June 4, 2020.

## III.    Conclusion

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** Defendant's Motion to Suppress, [Docket No. 60], be **GRANTED**, as set forth above.

Dated: April 15, 2022                                  s/Leo I. Brisbois
                                                       Hon. Leo I. Brisbois
                                                       U.S. MAGISTRATE JUDGE

### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.